[No. C016697. Third Dist. Sept. 29, 1994.]

In re DAVID D. et al., Persons Coming Under the Juvenile Court Law.
SACRAMENTO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
SHELLEY C., Objector and Appellant.

COUNSEL

John L. Dodd for Objector and Appellant.

D. Zilaff for Petitioner and Respondent.

OPINION

**NICHOLSON, J.**—Shelley C. appeals from a determination of the juvenile court declaring minors Derek, Darren, and David free from her custody and control. (Welf. & Inst. Code, § 366.26.)[1] We conclude inadequate reunification services were provided to this family, and also conclude the juvenile court erroneously denied regular visitation between this mother and her children after terminating reunification services, thus both violating the statutory directive and depriving the mother of the opportunity to come within the exception to adoptive placement expressly permitted when a parent has maintained a regular visitation schedule. Accordingly, we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

On March 22, 1990, Shelley voluntarily placed her two younger sons, Darren, age two and one-half, and David, age one and one-half, in foster care through the Placer County Welfare Department. At that time, Shelley told the social worker she "was unable to provide for the children due to personal stress in her life." On the same day, Shelley filed for divorce from her physically abusive husband.[2] Two months later, on May 22, 1990, Shelley contacted the welfare department to request foster placement for her oldest son Derek, age four, who had been staying with a relative.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.
[2] The minors' father is not a party to this appeal.

On May 24, 1990, the Placer County Welfare Department filed a petition pursuant to section 300, subdivision (b). According to the petition, Shelley told the welfare department she was "unable to care for any of her children at this time and requests that they remain in foster care."

The September 17, 1990, social worker's report states Shelley has "established a positive relationship with the foster family" and has "established a visitation schedule." The report notes Shelley "is looking for a permanent residence and cannot care for the children. . . . Her life is filled with change and turmoil, and continues to cause stress in her life."

On October 2, 1990, the minors were adjudged dependent children of the court pursuant to section 300, subdivision (b), and a reunification plan was adopted. On December 10, 1990, Sacramento County accepted the transfer of this case from Placer County. The referee ordered supervised visits between the parents and the minors "to consist of a minimum of one-hour visits to occur twice per month."

On March 4, 1991, the assigned social worker requested modification of the visitation order to permit unsupervised visits between Shelley and the minors, stating: "[Shelley] is complying with court orders and is working towards reunification. Supervised visits have been positive. [Shelley] is currently in parenting class through the American Red Cross, she is participating in counseling with Mike Streit, she has attended a domestic violence presentation at WEAVE, and she has maintained a stable employement [sic] at Kaiser Hospital where she works full time." The referee granted this modification.

The March 11, 1991, social worker's report states: "As the visits needed to be supervised and [Shelley] works full time until 5:00 P.M. each day, there was some difficulty arranging for supervision, as the foster parents were unwilling to do so. . . . [However,] the quality of the interaction between [Shelley] and the minors has been very good. The interaction is loving and affectionate, with [Shelley] paying attention to each boy. [Shelley] has also demonstrated during the visits the ability to supervise the boys and set limits for them. The boys run to her, are happy to see her, and cry at the end of the visits." The report notes Shelley "has complied with all the Court Orders," and concludes: "There is a substantial probability that the minors can be returned to the physical custody of [Shelley] . . . within the next six months . . . ."

The following month, on April 10, 1991, the social worker requested further modification of the visitation order to permit unsupervised overnight

visits between Shelley and the minors, stating: "Weekly, unsupervised visits from 6-8 hours long began March 9, 1991. The visits have gone well. [Shelley] describes using skills she learned in parenting class to set limits for the minors, to encourage the minors toward desired behavior, and to discipline the minors." The referee granted this modification.

Disaster struck at the end of April 1991. The minors visited Shelley the weekend of April 26-28, 1991. Over the course of the weekend, Shelley left the minors in the care of her brother and mother for several hours, during which time the minors' grandmother, Shelley's mother, spanked Darren sufficiently hard to leave bruises. Two of the minors also were ill over this weekend, and Shelley telephoned the advice nurse at Kaiser Hospital. The night of April 28, 1991, after Shelley had returned the minors to their foster home, she attempted suicide by overdosing on a prescribed medication, for which she was hospitalized. The social worker immediately asked the court to terminate overnight visits, stating: "It is this social worker's opinion that [Shelley] neglected the medical needs of the minors,[3] left them with other family members when she was supposed to be having a visit with them, and used poor [judgment] in leaving the minors in the care of her mother, who apparently used excessive force in corporal punishment of 3-1/2 year old Darren, resulting in bruising of his buttocks and back. It was also learned that the mother was admitted to a psychiatric hospital on April 28, 1991. It appears she is unable to responsibly provide care and supervision of the minors for overnight visits."

On May 9, 1991, the referee suspended Shelley's overnight visits with the minors, and, on July 9, 1991, the referee suspended maternal visitation altogether "pending receipt of all pertinent medical and psychiatric reports [regarding Shelley's] suicide attempt and hospitalization and treatment therefor. [Shelley] shall forthwith execute an authorization for release of such information." On August 5, 1991, the referee further suspended telephone contact between Shelley and the minors. The social worker requested this order, stating she informed Shelley on July 30, 1991, of social services' decision to recommend the minors be adopted, and, when so informed, Shelley "became hysterical and stated that the children would not remain in the foster home, that she would have me arrested, and that she would kill me before she would allow the children to be adopted." The social worker recommended the court transfer the minors to permanent placement.

At the contested 12-month review hearing on November 7, 1991, the referee ordered Shelley "to provide copies of medical and psychiatric

---

[3]The record contains Kaiser's documentation of Shelley's telephone call to the advice nurse. We also note the foster father testified the minors were ill with the flu *before* Shelley arrived to pick them up for the weekend.

records pertaining to her suicide attempt and hospitalization to the County Counsel by no later than 12:00 pm on November 12, 1991." Shelley's counsel objected on the basis these materials were privileged and not discoverable, and requested a stay. The referee denied counsel's request. Counsel's subsequent petition for rehearing was granted, whereby the court found, contrary to Social Services' assertion, Shelley had not "tendered the issue of her mental health for the purpose of this contested hearing that is coming up . . . ."[4]

On November 21, 1991, the referee declared a mistrial due to the public defender's conflict of interest, and set a new hearing date of January 2, 1992. Characterizing the case as "mishandled," Shelley's new counsel pleaded with the referee to suspend the proceedings, asserting the decision of Shelley's previous counsel to withhold the psychiatric reports had resulted in the termination of Shelley's visitation rights and ultimately was jeopardizing Shelley's parental rights. Counsel argued "but for that termination [of visitation] and but for the refusal to turn over the records, I think that the September 26th report could have easily been different in its conclusion." The referee denied counsel's request, stating, "[T]he court is required to address the issues pertinent to a second Subsequent Review at this time, and if the answers regarding reunification be in the negative, then I think the law is clear and the statutory schemes speaks [sic] very strongly that it is incumbent upon the court to provide permanence for the children which is appropriate to their situation . . . ."[5]

The witnesses at this contested permanency planning hearing included Shelley, one of the foster parents, employees of the department of social services, counselor Michael Streit, a caseworker from Women Escaping A Violent Environment (WEAVE), Shelley's sister, and Dr. Mary Ann Frank. In anticipation of this hearing, the juvenile court had appointed Dr. Frank to conduct a bonding assessment. Dr. Frank's written report was submitted to the court and was considered at this hearing. We set forth the questions the court asked Dr. Frank to address, together with Dr. Frank's conclusions, in detail:

---

[4]Social services asserted the right to review Shelley's medical records pursuant to Evidence Code section 1016, which provides, in pertinent part: "There is no privilege under this article as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by: [¶] (a) The patient." Social services contended Shelley had "tendered the issue of her mental or emotional condition by . . . voluntarily placing her children in foster care on March 22, 1990 due to personal stress in her life." The court determined social services had not demonstrated an exception entitling them to the medical records.

[5]The parties stipulated although the minors had been in foster placement more than 18 months, this was only the second subsequent review, not the third.

"Q: Would it be beneficial to the boys to have a continuing relationship with their mother, even though she may not be their custodial parent? [¶] O: Yes. The behavior and verbal responses by each of the minors evidences an attachment to their mother. The data indicates that each of the minors is psychologically and emotionally attached to his mother. Each of the minors can benefit from this attachment. Due to the mother's emotional problems, inconsistent parenting of the minors can be a result of her difficulty in dealing with stress due to her limited support system, and poorly internalized behavior controls. The data indicates that the mother can manage only minimal contact with the minors and only under supervised conditions. Under long-term supervised, controlled conditions, such as an agency that provides structure and supervision, the minors can have structured supervised minimal contact with their mother in order to continue to build and nurture their relationship with her. Under these controlled conditions, the relationship between the minors and their mother will be protected and aimed at fostering a positive relationship between the minors and their mother. The data indicates that the minors are stabilized in their current foster home. Each of the minors has a positive child/parent attachment to their foster parents. The foster parents have contributed to the establishment of trust. The cycle of trust needs to continue under controlled conditions between the minors and their birth mother as it exists between the minors and their foster parents.

"Q: Would it be detrimental for the boys to have a relationship with their mother? [¶] O: No. The mother and the minors have not remained psychologically and/or emotionally detached from each other. The no-contact separation from 5/91 to 2/92 between the minors and their mother was an act of a court order to not allow contact between the minors and their mother because the mother refused to authorize release of psychiatric reports resulting in a deprivation of the benefit of continuing with her parental relationship and terminating the reunification agreement. The responses and behavior by the minors during the individual and family sessions indicate that the minors should not be totally deprived of parent visitation because their psychological and emotional attachment to their mother supports that minimal supervised contact with their mother would not adversely affect them. No contact with their mother can cause an intense need of their mother which if not satisfied, the frustration and longing for their mother can result in grief. Grief in childhood is not short-lived and forgotten. Yearning for the mother's return goes on. All three minors['] responses indicated that they are aware of who their mother is. Each minor stated that he wants to see her. Each minor stated that he loves her. The mother needs to demonstrate to the court an ability to consistently follow through with requests made of her by the court and to demonstrate an ability to manage her own lifestyle before

she can even begin to accept the parenting responsibility of the three minors. Dr. Shawn Johnston recommended that the mother's parental rights should not be severed at this time, and that she be allowed to begin supervised visitation with her children. Only if in the future, while under controlled supervised conditions, the mother demonstrates to the court that she is unable to provide stability, continuity and a loving relationship with each of the minors should no contact occur."

Dr. Frank's testimony at the hearing was consistent with these conclusions. Dr. Frank testified it was her opinion "the minors should have some type of contact with their biological mother. . . . The findings of my observations and the responses by the minors indicated that they are psychologically and emotionally attached to the mother." Dr. Frank stated no matter what plan was implemented for the minors, it was her opinion the minors should continue to have contact with their mother.

At the conclusion of the contested permanency planning hearing, the referee stated: "[T]he issue really isn't the proposition the children be returned to their parent today. But I think the record is abundantly clear and without reasonable question that a return of these children to a parent at this time and in that sense we are talking about the mother obviously would be detrimental to these children. And the court makes that finding. . . . [¶] These are adoptable children. . . . [¶] The finding of adoptability concerning which the court has made a preliminary threshold finding today is not itself determinative of the issue of adoption. Until the court confirms through its analysis the absence of a statutory exception to adoption for an otherwise adoptable child, the issue that is presented here is subsection (A) under (C)(1). [¶] The question being whether the minors' parent in this case, the mother has maintained regular visitation and contact with the minors and whether the minors would benefit from continuing the relationship. [¶] Dr. Frank's analysis is pertinent to this issue that's a two-part issue. With respect to the second issue, this record before the court at this time I believe confirms without material contradiction that within a pertinent range of potential benefit these minors would foreseeably at this time benefit from a continuation of that relationship. [¶] The first issue is whether the minors' mother's contacts with these children bring her and her relationship with them within the statutory exception on the basis that she has maintained regular visitation. [¶] There is no question but that her visitation has been in a state of suspension. And there has been therefore an absence of what would be in the generally accepted meaning of regular visitation during that period of suspension. [¶] An interesting mix of factors and other elements have produced the state of the suspension of maternal visitation. [¶] The record suggests it is a combination of maternal choice and legal . . .

advice. . . . [¶] The court insisted that it become informed in order to make an intelligent risk assessment for the children. The minors' mother cho[se] to accept and act upon apparently the advice of counsel and to withhold participation . . . . [¶] It was the actions of others and not the court which accentuated and prolonged the suspension of visitations and contacts. But for the—let me reword that. Other than during this period of impasse I think the record reflects regular visitations. [¶] If asked to decide in these proceedings today whether these visits during the entirety of the pertinent period of time were regular, I am unprepared to rule at this time because I don't feel that is an issue that is incumbent upon me. *But I do feel it is incumbent upon the court at this time to acknowledge the existence of a substantial issue in this case regarding the potential existence of a statutory exception to adoption for these children.* [¶] This being the case, I believe it is imperative that permanency planning occur for these children at the hearing that this court intends to calendar. [¶] Therefore, in addition to the court's finding regarding the likelihood of adoption, the court makes an additional finding that in the event that adoption is not available as a matter of law to these children guardianship is appropriate. . . . [¶] The court orders that the minors remain as currently placed in the care and custody of the director of the Department of Social Services. The court orders that reunification services be terminated. [¶] The court orders that this matter be calendared for hearing pursuant to provision of section 366.26 of the Welfare and Institutions Code. . . . [¶] The court further orders that pending further hearing and further court order the minors['] mother may have one supervised visit not to exceed two hours in duration . . . . [¶] Pending further court order the minors' mother shall not otherwise contact the minors nor their caretaker, nor be present at or about or within 150 yards of their residence or other place where the minors are present." (Italics added.) The section 366.26 hearing was set for July 29, 1992.

At the section 366.26 hearing regarding the termination of Shelley's parental rights, only three witnesses testified: Shelley, a social worker, and a clinical psychologist. The social worker testified she was recommending adoption rather than guardianship "because under a plan of guardianship ongoing parental visitation takes place, my feeling is that it would not be in the children's best interest to maintain ongoing visitation with their mother, thereby precluding a plan of guardianship and my recommendation was in favor of a plan of adoption despite Dr. Frank's recommendation." When asked why she disagreed with Dr. Frank's recommendation, the social worker replied: "My observation—now granted *I only had the one visit between the minors and their mother*, which took place on I believe July 1st of '92. I did not see at that time any indication of any strong bonding between the boys and their biological mother which would indicate a need

for ongoing contact." (Italics added.) The social worker acknowledged the July 1 visit was positive, the mother was clearly thrilled to see the minors, and the interaction between the mother and the minors was relaxed. The social worker also acknowledged this single two-hour visit was the sole source of her information and observations regarding the relationship between the mother and the minors. The social worker testified she favored adoption over guardianship because Shelley was "not supportive of the children maintaining their placement in their current foster home. That her sole goal really is to have the children reunited with her. [¶] . . . [M]y experience in the visit which took place on July 1st was that on at least one occasion she indicated to one of the children that the foster mother is not the mother, that she's the mother . . . ."[6]

A report from Dr. Jeffrey Miller was also in evidence, containing psychological testing results of the three minors. Dr. Miller observed the interactions of the three minors with their foster parents for one hour at the foster parents' home, and their interactions with Shelley for 45 minutes at Dr. Miller's office. During the visit with Shelley, Dr. Miller noted: "At the beginning of the session, all three of [the minors] hugged their mother. They spent most of their time playing different board games on the floor. The boys seemed to be happy to see her and she responded in a very positive and supportive manner with them. She was able to appropriately set limits and also to praise them for compliance. . . . The boys took turns sitting on their mother's lap and accepting physical affection by her." At the end of the session, out of the presence of the minors, Dr. Miller had a discussion with Shelley, during which Shelley stated "she is contented to allow the minors to

---

[6]This social worker's adoption report, filed in anticipation of the section 366.26 hearing, states: "On September 8, 1990, while visiting in the foster home, the Placer County Social Worker noticed two bruises on Darren's left leg. When Darren was questioned about the bruises he stated, 'my mom spanked me.' The foster parent reported that Darren had marks on his buttocks when he returned from the home visit with his mother on September 1, 1990. [¶] On October 24, 1990, the Placer County Social Worker investigated another incident of physical abuse. On that occasion, Derek returned from a home visit with a bruise on his buttocks. Derek reported to the foster parent, the social worker and a police officer that his mother had spanked him because he had touched a motorcycle. [¶] Following the second incident of corporal punishment, unsupervised visits between the minors and their mother were suspended. Between November of 1990 and March of 1991, all visits were supervised."

The record reflects substantial ambiguity concerning this issue. Shelley contended the foster parents employed corporal punishment, and indeed, the record reflects the foster parents admitted using "physical punishment on occasion with their own child, [but denied] using physical punishment with the minors." The record also reflects the minors began referring to their foster mother as "mom" and "mommy" within a month of the time they began living with the foster parents, and called Shelley their "other mom." The foster father testified after Shelley accused them of using physical punishment, he telephoned Shelley and told her if the minors were removed from his home and no other foster home was available, the minors would be sent to a receiving home and it would be her fault. Shelley withdrew the allegations, and no child abuse charges were filed concerning this matter.

remain with their current foster parents, but is opposed to the foster parents taking over her role as their mother. . . . She expressed a strong desire to eventually have the minors placed back in her care." From these observations, together with information provided in the social worker reports, Dr. Miller concluded: "While the minors clearly enjoy seeing their mother and are affectionate towards her, there are concerns about the mother's continuing efforts to pursue reunification with them, and her resentment towards the foster mother for 'taking over' her role as their mother. These ongoing conflicts are likely to undermine the minors' adjustment to their current foster home. While it would probably be detrimental to their natural mother, · it would not be detrimental to the minors if their contacts with their mother were stopped at this time."

Dr. Paul Mattiuzzi, a clinical psychologist, submitted a written report and testified at the hearing. Dr. Mattiuzzi criticized Dr. Miller's report, stating Dr. Miller's diagnoses "are incorrect. They are not consistent and are contradicted by virtually all of the collateral documentation, and the diagnoses are not consistent with the data he himself has obtained." Dr. Mattiuzzi's report concluded: "Absent a clear and compelling reason to the contrary, it would never be in the child's best interest to be deprived of contact with an adult caretaker with whom they have formed a positive identification and attachment relationship. Dr. Miller, Dr. Frank, and the various Social Workers who have described this case have all described the children as having a positive attachment to their mother. . . . Depriving them of access to her could have significant and far-reaching effects on their development and their emotional and psychological well-being. Absent an indication that she is harmful to them, there is no justification for her to be removed from their lives."

At the hearing's conclusion, the referee found the minors adoptable and declared them free from Shelley's custody and control.

## DISCUSSION

▉ "The right of parents to raise their own children is so fundamental that termination of that right by the courts must be viewed as a drastic remedy to be applied only in extreme cases." (*In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1326 [255 Cal.Rptr. 498].) ▉ Here, one error was compounded upon another, resulting in a situation analogous to putting these three children on a train with only one destination.

This is an extraordinary and troubling case. This mother voluntarily placed her children in foster care because she was escaping an abusive

environment and could not adequately care for the minors at that time. The social worker wrote glowing reports of the mother's progress and recommended the minors be returned to the mother within six months. However, when the mother's depression resulted in her attempted suicide by overdose of a prescribed medication, all efforts to help ceased. Instead of responding to the mother as disabled and in need of assistance, both the social worker and the juvenile court responded with an appalling lack of compassion for both the mother *and the minors*. The court's initial, appropriate, response was to permit shorter, supervised visits. However, when the mother, on the advice of counsel, did not deliver her hospital records to the court, the court suspended all visitation and the social worker labeled the mother "uncooperative." The social worker's recommendation was transformed from reunifying the mother and her children within six months to terminating the mother's parental rights and placing the children up for adoption.

After the mother's suicide attempt, the change in the attitude of the social worker is reflected in the reports and the testimony. The social worker criticizes the mother for reacting strongly when informed of the department's decision to seek termination of the mother's rights and adoptive placement for the minors—a decision representing an unexpected 360-degree turnabout from the department's position only 3 months earlier. The record reflects the minors began referring to their foster parents as "mommy" and "daddy" shortly after their placement, but when the mother explained to one of the minors she is their "real" mother and the current caretaker is his foster mother, the social worker interrupted the conversation and told Shelley she was "confusing" the minor. The minors were instructed to call their biological mother "Shelley." The mother is repeatedly criticized as "selfish," and as not having her children's best interests at heart because she did not want to relinquish her parental rights and permit adoption of her children by the foster parents.[7] This distortion of reality is Kafkaesque.

The referee's rulings blame Shelley for the suspension in visitation: "She is entirely free to never comply with my order, the consequences of never complying with my order is [sic] that the order for suspension of contact remains in force." "The minors' mother cho[se] to accept and act upon apparently the advice of counsel and to withhold participation . . . . [¶] It was the actions of others and not the court which accentuated and prolonged the suspension of visitations and contacts." We will not condone such an

---

[7]During the social worker's testimony, social services introduced copies of a letter Shelley had written to the Governor asking him to intervene in this case. The social worker testified these letters indicated Shelley "was not taking much responsibility for why [the minors] were in care to begin with and . . . she was not acknowledging what was in the best interest of the children. It appeared that her primary concern was what was in her best interest."

interpretation. Whether the court suspended visitation as a punitive measure to force Shelley to relinquish her medical records, as Shelley's counsel suggests, or whether the court suspended visitation as a form of "insist[ing] that [the court] become informed in order to make an intelligent risk assessment for the children," as claimed by the court, is irrelevant. In either event, the court's suspension of visitation was inappropriate. The mother and the minors had a regular visitation schedule. The mother's attempted suicide did not involve violence toward the minors, and the attempted suicide did not occur in the minors' presence. The indefinite suspension of visitation simply cannot be said to have been in the minors' best interests. Under the circumstances presented, the court's concern for the minors was adequately demonstrated by requiring supervised visitation. The court did not take into consideration the effect an abrupt termination of visitation would have upon the minors.

██ " 'Harm to the child cannot be presumed from the mere fact of mental illness of the parent and it is fallacious to assume the children will somehow be "infected" by the parent. The proper basis for a ruling is expert testimony giving specific examples of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety. . . . It cannot be presumed that a mother who is proven to be "schizophrenic" will necessarily be detrimental to the mental or physical well-being of her offspring. . . . The social worker must demonstrate with specificity *how* the minor has been or will be harmed by the parents' mental illness.' " (*In re Heather P.* (1988) 203 Cal.App.3d 1214, 1228-1229 [250 Cal.Rptr. 468], overruled on other grounds, *In re Richard S.* (1991) 54 Cal.3d 857, 866, fn. 5 [2 Cal.Rptr.2d 2, 819 P.2d 843], internal citations omitted, italics in original.)

██ An order terminating reunification services and setting a hearing under section 366.26 is reviewable on appeal from the final judgment terminating parental rights. (*In re Matthew C.* (1993) 6 Cal.4th 386, 401 [24 Cal.Rptr.2d 765, 862 P.2d 765]; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1210 [31 Cal.Rptr.2d 75].)

██ The juvenile court specifically found "reasonable reunification services have been provided and offered to the parents in this case." Although the juvenile court is accorded broad discretion in these kinds of disputes, under the circumstances of this case the court abused its discretion, resulting in a miscarriage of justice. (See *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1068 [24 Cal.Rptr.2d 654].) Due to the court's order prohibiting visitation between this mother and her children, adequate reunification services were not provided. The Legislature has mandated "every order placing a minor in

foster care, and ordering reunification services, shall provide for visitation between the parent or guardian and the minor. Visitation shall be as frequent as possible, consistent with the well-being of the minor." (§ 362.1.) Although the reunification plan provided for visitation, the subsequent actions of the court precluded any visitation opportunities. There is no meaningful distinction between a case in which no reunification plan was ever developed and the case presented here, in which a plan was developed but not implemented during most of the reunification stage. (See *In re Daniel G., supra,* 25 Cal.App.4th at p. 1213.) The referee's finding reasonable reunification services were provided is not supported by the evidence.[8]

We further observe the juvenile court was *required* to permit continued visitation pending the section 366.26 hearing absent a finding visitation would be detrimental to the minors. (§ 366.21, subd. (h); *In re Heather B.* (1992) 9 Cal.App.4th 535, 544 [11 Cal.Rptr.2d 891]; see also § 366.22, subd. (a).) Not only did the court make no such finding of detriment, but, to the contrary, the court stated: "[T]his record before the court at this time I believe confirms without material contradiction that within a pertinent range of potential benefit these minors would foreseeably at this time *benefit* from a continuation of [the] relationship [with their mother]."[9] (Italics added.)

Section 366.26, subdivision (c)(1)(A) provides: "The court shall terminate parental rights only if it determines by clear and convincing evidence that it is likely that the minor will be adopted. If the court so determines, the findings . . . that reunification services shall not be offered . . . shall then constitute a sufficient basis for termination of parental rights unless the court finds that termination would be detrimental to the minor due to one of the

---

[8]At the contested permanency planning hearing, Shelley's counsel acknowledged "there may not be a reasonable probability of reunification within six months." However, this concession is irrelevant in light of the failure to provide reasonable reunification services. Section 366.21, subdivision (g)(1) expressly states the juvenile court shall continue the case for up to six months "if it finds that there is a substantial probability that the minor will be returned to the physical custody of his or her parent or guardian within six months or that reasonable services have not been provided to the parent or guardian. . . . *The court shall not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or guardian.*" (Italics added.) (See *In re Daniel G., supra,* 25 Cal.App.4th at p. 1211 [rejecting contention 18 months is "outer limit" for reunification efforts and thus if child cannot be returned to parent the court must order a section 366.26 hearing regardless of whether reasonable reunification services have been provided].)

[9]The court twice mentions detriment, once in the context "that a return to parental custody at this time would be detrimental to these minors," and again in discussing the previous suspension of visitation after Shelley's suicide attempt. There was no express finding the court was denying visitation due to a perceived detriment to the minors. In light of the court's express finding the minors would benefit from a continuing relationship with Shelley, neither may such a finding be implied.

following circumstances: [¶] (A) The parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship." Section 366.26 permits the court, "[w]ithout permanently terminating parental rights, [to] appoint a legal guardian for the minor and issue letters of guardianship." (§ 366.26, subd. (b)(3).)

The court was presented with overwhelming evidence of the minors' bond with their mother. Despite this evidence, the court compounded its errors by providing Shelley with only one two-hour visitation between the termination of reunification services and the date of the section 366.26 hearing, which obviously was intended to constitute a "final" visit. The injustice is particularly acute in light of the court's own observation of the potential for a statutory exception in this case which would have precluded adoption. By restricting the visitation to this final meeting, the court ensured the "regular visitation" necessary to satisfy the statutory exception could not be satisfied.[10]

Indeed, the department of social services used the court-ordered prohibition against visitation against Shelley at the section 366.26 hearing to argue strenuously against applying the statutory exception to the termination of parental rights. "During the last two years it was shown that these children have only seen their mother for one visit . . . which lasted about two hours. Total they seen [sic] their mother four times. The other three times we are dealing with evaluations of one form or another for different hearings or another. [¶] But total time that these children have seen their mother in the past two years since May the 30th, 1991 has been four hours and 45 minutes. [¶] I would submit that does not even come close to constituting regular visitation and contact. . . ."

Social services emphasizes the length of time these minors have been in foster placement. We acknowledge this consideration. However, the referee steadfastly ignored the best interests of these minors, impeding both reunification and continued parental contact, by the initial suspension of visitation, by ignoring the recommendations of the court-appointed expert regarding the minors' bond with their mother, by terminating reunification services, and by unreasonably limiting visitation after the termination of reunification services. "While the Legislature was concerned with reducing delays in arriving at a permanent resolution of the child's placement, we do

---

[10]The juvenile court scheduled the section 366.26 hearing for nearly four months after the date reunification services were terminated. In light of the court's express limitation of the contact between Shelley and the minors during this four-month period to a single visit, rather than, for example, a visit once weekly or once monthly, the authorization of this single visit cannot be deemed "continued" visitation. (See generally § 362.1 ["Visitation shall be as frequent as possible, consistent with the well-being of the minor."].)

not believe the Legislature intended a speedy resolution of the case to override all other concerns including 'the preservation of the family whenever possible' especially given the lengths to which the Legislature went to try to assure adequate reunification services were provided to the family." (*In re Daniel G., supra*, 25 Cal.App.4th at p. 1214.)

Under the circumstances of this case, an additional six months of reunification services are warranted, during which Shelley must be provided an opportunity to reestablish regular visitation with the minors. (See *In re Kristin W.* (1990) 222 Cal.App.3d 234, 255 [271 Cal.Rptr. 629].) In light of this conclusion, it is unnecessary to address Shelley's remaining contentions.[11]

### DISPOSITION

The judgment (order) terminating Shelley's parental rights and ordering the minors placed for adoption is reversed. The juvenile court is directed to enter an order providing for six months of reunification services with visitation between Shelley and the minors "as frequent as possible, consistent with the well-being of the minor[s]." (§ 362.1.)

Sims, Acting P. J., and Davis, J., concurred.

A petition for a rehearing was denied October 27, 1994.

---

[11]Shelley attempted to demonstrate a change in her circumstances during the section 366.26 hearing. The filing of a petition pursuant to section 388 is the appropriate method to demonstrate a change of circumstances has occurred which warrants a modification of any previous court orders or the termination of the juvenile court's jurisdiction.